IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **TRINETTE COLEMAN,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-17-1164 |
| **RYAN MCCARTHY,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Trinette Coleman ("Plaintiff") filed an Amended Complaint against her former employer, Ryan McCarthy in his capacity as Secretary of the United States Department of Defense ("Defendant"), alleging discrimination on the basis of race, color, and gender, and a hostile work environment. ECF 15. Discovery is now concluded. Defendant filed a motion for summary judgment, ECF 58, which I have reviewed along with the relevant exhibits, opposition, and reply. ECF 59, 62, 63. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant Defendant's Motion for Summary Judgment.

**I.    FACTUAL BACKGROUND**

The facts contained herein are taken in the light most favorable to Plaintiff, the non-moving party. After successfully serving as a Budget Analyst, GS-9, for the United States Department of the Army at Fort Bragg, Plaintiff moved with her family to Korea. ECF 62-1 at ¶¶ 3, 4; ECF 59-13 at 5. She was hired to serve as a Management Analyst, GS-9, for the Army in the 65th Medical Brigade in Youngsan, Korea, where she received glowing performance reviews. ECF 62-1 ¶¶ 5-6; ECF 49-13 at 4.

On February 12, 2012, Plaintiff began working as a Budget Analyst, GS 11/12, at the branch of the Civilian Human Resources Agency — Far East ("CHRA") in Seoul. ECF 59-1 at 31 (Pl. Dep.); ECF 62-1 ¶ 8. She was hired by James Bridges, Sr., an African-American man who then served as CHRA's regional director. ECF 59-6 at 7-8. At the time of her hiring, Plaintiff was unaware that charges of anti-Korean bias had been lodged against Mr. Bridges. ECF 62-1 ¶¶ 10-11. Plaintiff was the only CHRA budget analyst stationed in Seoul. ECF 59-12 at 103. After Plaintiff was hired, the CHRA received an anonymous complaint suggesting that Plaintiff "knows nothing about budget" and was selected because she is African-American. ECF 59-2 at 396; ECF 62-1 ¶ 18. Plaintiff also described an "active rumor mill," which spread the story that she was "not qualified for the Budget Analyst position and was only hired because [she] was a black/African American woman." ECF 62-1 ¶ 10.

Plaintiff's primary co-worker in Seoul, Eunjoo Cha, was a Korean-American female. *Id.* ¶ 8. When Plaintiff was hired, Ms. Cha was serving as a GS-11 Management Analyst, which was slightly lower than Plaintiff's GS-11/12 rank. ECF 59-5 at 1. However, Ms. Cha had been covering the duties of the Budget Analyst while the position was unoccupied. *Id.* at 3. Ms. Cha treated Plaintiff in an unfriendly fashion throughout her employment. ECF 62-1 ¶¶ 9, 11, 13. Ms. Cha told Plaintiff that she "was only selected by Mr. Bridges for the position because [she] was black/African American" and that Mr. Bridges was racist. *Id.* ¶ 10.

A few weeks after Plaintiff began working for CHRA, a new first line supervisor, Bruce Skillin, arrived in Korea. *Id.* ¶ 15. Mr. Skillin did not work in Seoul, but visited occasionally and had regular contact with the office he supervised by telephone and email. *Id.* Mr. Skillin developed a good relationship with Ms. Cha. *Id.* ¶ 16. Mr. Skillin told Plaintiff, within weeks of his arrival, "I would have never hired you, you don't know what you're doing and I don't know

2

budget and can't teach you what you should already know." *Id.* ¶ 17. Plaintiff responded, "are you sure it isn't because I'm black?" *Id.*

After an investigation of anonymous complaints, the Army placed Mr. Bridges on administrative leave and removed him from his position. *Id.* ¶ 19. The investigation included interviews of all CHRA employees in the Far East region. ECF 59-2 at 162. During Plaintiff's interview, the investigator asked her whether she was having an intimate relationship with Mr. Bridges, which she denied. ECF 62-1 ¶ 21. Plaintiff was upset by the allegations, which she viewed as racist, and vocalized her grievances in the workplace, including to Ms. Cha. *Id.* ¶ 25. Plaintiff also told Mr. Skillin and Mr. Bridges's replacement, Clifford Dickman, that she "believed that both they and Ms. Cha did not like [her] because [she] was African-American/black and because Mr. Bridges had selected [her]." *Id.* ¶¶ 25, 27. The investigator's report contained a finding that Mr. Bridges "made a very questionable selection of an individual [Ms. Coleman] with limited budget experiences." *Id.* ¶ 26.

Plaintiff did not receive adequate guidance on her work tasks from Mr. Skillin, Mr. Dickman, and Ms. Cha, and their interactions with her were brusque and negative. *Id.* ¶¶ 28, 29. Ms. Cha worked in an office next to Plaintiff and repeatedly accused her "of being racist, of hating Koreans," and "of having a strange accent." *Id.* ¶ 31. Ms. Cha complained to Mr. Skillin "at one point" that Plaintiff "didn't like Korea, so why was she here." ECF 59-4 at 34-35. She also told Mr. Skillin, "during the investigation into Mr. Bridges," that "she felt she had not been selected for Ms. Coleman's position because Mr. Bridges preferred to hire African-Americans." *Id.* at 52. Otherwise, Ms. Cha came to Mr. Skillin to complain about Plaintiff on "numerous occasions," including "a couple of week or month period where both [Ms. Cha and Plaintiff] were complaining about each other." *Id.* at 33. Ms. Cha's complaints centered around the fact that Plaintiff wasn't

3

learning what Ms. Cha was trying to teach her, and that Plaintiff was asking Ms. Cha to do the work instead. *Id.* at 33-34.

Plaintiff alleges that she "was subjected to continuous and regular criticism" for minor errors, whereas Ms. Cha made more serious mistakes but received no criticism. ECF 62-1 ¶ 42. Ms. Cha often socialized with Mr. Skillin and Mr. Dickman, while Plaintiff did not. *Id.* ¶ 49. Plaintiff alleges that Ms. Cha received more training and was afforded the opportunity to cross-train as an HR specialist during work hours. *Id.* ¶¶ 41-42. Specifically, Plaintiff did not receive meaningful training or access to the General Fund Enterprise Business System ("GFEBS") she needed to perform her job. *Id.* ¶ 29. The situation caused Plaintiff significant stress, because she often had to "wait until the budget analyst at the headquarters in Maryland came to work" so that she could get assistance with her tasks. *Id.* ¶ 33.

In the summer of 2012, Plaintiff reached out to Carla Hornsby, the Resource Management Division Chief from the headquarters at Aberdeen Proving Ground ("APG") in Maryland, for assistance. *Id.* ¶ 36. Ms. Hornsby urged Mr. Skillin and Mr. Dickman to send Plaintiff to APG for training. *Id.* The supervisors approved the training and sent Plaintiff to headquarters to close out the budget with Ms. Hornsby and her team in "either the end of 2012 or the early part of 2013." *Id.* ¶ 37; ECF 59-14 at 23. After the training, Mr. Skillin and Mr. Dickman agreed that Plaintiff was able "to complete tasks readily." ECF 62-1 ¶ 37.

On January 15, 2013, Mr. Skillin and Mr. Dickman gave Plaintiff a rating of "fair" for her work performance during the period from her arrival at CHRA in February, 2012, through the end of October, 2012. *Id.* ¶ 50, ECF 62-1 at 58-60. The performance evaluation stated:

> Ms. Coleman has faced a steep learning curve since coming on board and she continues to learn the skills required of the position. Though learning, Ms. Coleman is still improving on the skills at the GS-11 level and not yet prepared

4

> to assume the challenges required of a GS-12. In an ideal situation, Ms. Coleman would be in a larger Resource Management shop where she would have broader exposure and closer supervision from a RM.

ECF 62-1 at 59. As a result of the "fair" rating with certain objectives marked "needs improvement," Plaintiff could not receive a promotion from GS-11 to GS-12 on the one-year anniversary of her hiring in February, 2013. *Id.* ¶ 52. After receiving her performance evaluation, Plaintiff filed an EEO complaint, contending that her low rating and denial of promotion resulted from discrimination. ECF 59-2 at 34. Mr. Skillin "spent more time watching and providing feedback" to Plaintiff beginning in January, 2013, "to ensure she was to fully satisfactory at work [or] better in order to get a new rating in May 2013." ECF 59-4 at 71-72. Specifically, he attended more of her budget committee meetings, provided her specific feedback on her presentations, and checked in with her more frequently for interim updates on her assigned tasks. *Id.* at 72-74.

Plaintiff received an updated performance evaluation on May 31, 2013, covering the period from her hiring through that date (seven months longer than the rating period from her initial evaluation, and encompassing the period after her training at APG). ECF 62-1 at 77-78. Her rating was changed to "successful," and the comments noted, "Her abilities have increased to the point that she is fully proficient and is ready for promotion to the GS-12. With some more stable surroundings of a larger or more established Budget Office, Trinette has the ability to flourish." *Id.* Plaintiff received the promotion to GS-12, and served at that level in her subsequent position at Fort Drum, New York. *Id.* ¶¶ 53, 57. Since leaving CHRA, all of Plaintiff's performance appraisals have been excellent and she has received numerous commendations. *Id.* ¶ 57, *id.* at 34, 79-93.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment,

a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.     ANALYSIS

Two counts of Plaintiff's Amended Complaint remain: (1) discrimination on the basis of race, color, and gender; and (2) hostile work environment.  ECF 15; ECF 36.

### A. Race, Color, and Gender Discrimination

Plaintiff proffers no direct evidence of Defendant's intent to treat its employees differently based on their race, color, or gender. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (defining direct evidence as evidence that "reflect[s] directly the alleged discriminatory attitude" and "bear[s] directly on the contested employment decision" (quoting *Taylor v. Va. Union Univ.*, 193 F.3 219, 232 (4th Cir. 1999) (en banc))).  She must therefore employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, she must first establish a prima facie case of discrimination, including evidence (1) that she is a member of a protected class, (2) that she was meeting her employer's legitimate job expectations, (3) that she suffered an adverse employment action, and (4) that similarly situated

employees outside of the protected class were treated differently.[1] *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

Plaintiff is a member of several protected classes, and arguably has established that she suffered an adverse employment action in CHRA's failure to promote her from GS-11 to GS-12 for the four-month period between February, 2013 and May, 2013, which impacted her rate of pay during that limited window.[2] However, she has failed to establish the other two components of a prima facie case.

First, she has not shown that she was meeting her employer's legitimate job expectations at the time her performance evaluation was issued, which contained the assessment that she was

---

[1] As Plaintiff suggests, ECF 62 at 31, there are some cases that do not require the plaintiff to present a comparator in order to make a prima facie case of discrimination because other circumstances "give rise to an inference of unlawful discrimination," for example, where instead of hiring a fully qualified plaintiff for an open position, a defendant continues to look for other applicants with the plaintiff's same qualifications. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253-54 (1981); *Bryant v. Aiken Regional Med. Ctr., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003) ("We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question.") However, the record in this case does not present the kind of employment decisions that "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254. As further discussed *supra*, Plaintiff's supervisors had non-race-based reasons for not promoting her after her first year of employment.

[2] Plaintiff's general grievances about what she perceived as more favorable treatment of Ms. Cha, such as "less criticism" do not constitute actionable discrimination, because they did not affect the terms and conditions of her employment and are not adverse employment actions. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (explaining an act is an adverse employment action where it "adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment" (alteration in original) (quoting *Von Guten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001))); *Von Gunten*, 243 F.3d at 868-69 (determining that a critical performance review that did not alter the terms, conditions or benefits of employment was not an adverse employment action). Routine workplace criticism does not meet that standard. Arguably, here, Plaintiff's "fair" performance evaluation in January, 2013 and the delay in affording her in-person training would be relevant only to the extent they are viewed as reasons for the four-month postponement of her promotion.

not ready for promotion to the GS-12 level.  Importantly, it is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Defendant provided evidence, in the form of the testimony and emails from Plaintiff's supervisors, that she was not performing satisfactorily in the early stages of her tenure.  *See* ECF 59-2 (Dickman Decl.) at 162 ("She was hired with the presumption she had the skills to perform at the GS-11 level.  It became apparent in her first few months, that she didn't have the skills to be a fully functioning GS-11."); 59-2 at 154 (Skillin Decl.) ("Ms. Coleman routinely made simple errors on the PBAC (Programmed Budget Advisory Council) that all CHRA Regions sent to HQ throughout the year."); ECF 59-12 at 80-82 (Dickman Depo.) (explaining he "did not think that Ms. Coleman currently grasped all the complexities associated with her position" because of the regular inaccuracies and errors in her work, including reports that "did not require GFEBS," and that because Plaintiff repeatedly missed deadlines, he required her to submit the reports to him twenty-four hours prior to the headquarters deadline to ensure they were not late); ECF 59-14 at 25, 35-38 (Hornsby Depo.) (describing conversations with Mr. Dickman, Mr. Skillin and her analysts about Plaintiff's performance and the supervisors' desire to place Plaintiff on a performance improvement plan); ECF 59-3 at 9 (email from Dickman to Hornsby citing Plaintiff's "large knowledge gap in the basics of budgeting, specifically lines of accounting, use of correct fund cites, interface between GFEBS, DTS and other financial systems, etc." and stating "the 'learning' here has not been at the pace or to the level desired").  Plaintiff herself acknowledges that, in the early months of her employment, she "was not in a position to execute all the budgeting duties in that [she] did not have access to GFEBS systems, nor had [she] received any training on the specifics of the particular tasks for that office."  ECF 62-1 ¶ 12.  The uncontroverted evidence

demonstrates that Plaintiff's supervisors believed she should have had more relevant experience and should have been able to perform her job duties without further training or explanation; that Plaintiff repeatedly sought training, explanation, and clarification about her role to no avail; and that after she was afforded the opportunity to travel to APG for more in-depth training, her performance improved.  Though Plaintiff quite logically suggests that her performance would have improved sooner had she been better trained earlier, she cannot demonstrate that her employer's baseline expectations regarding her ability to perform GS-11 tasks without extensive or in-person training were illegitimate or unreasonable.  Thus, "even when viewing the evidence in the light most favorable to" Plaintiff, "no reasonable jury would find that [s]he was meeting [Defendant's] legitimate performance expectations" during the earlier period at issue, which constituted the vast majority of the initial evaluation period.  *Warch*, 435 F.3d at 518.

Second, Plaintiff has not shown that similarly situated employees, outside of her protected classes, were treated differently with respect to the adverse employment action she alleges.  The only comparator she cites is Ms. Cha, which is inherently fatal to her gender discrimination claim because Ms. Cha is also female and is not outside of Plaintiff's protected class.[3]  Even as to color and race, however, Ms. Cha is an insufficient comparator because Plaintiff has not established that she was similarly situated with respect to the adverse employment action alleged.  Ms. Cha had a different job title, Management Analyst, and different job duties.  *See Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010) (requiring a showing that a plaintiff is "similar in all relevant respects to [her] comparator.").  Ms. Cha's job was not a "developmental position," like Plaintiff's,

---

[3] At deposition, Plaintiff mentioned two white men who worked for Mr. Skillin and Mr. Dickman before her tenure, but was unable to articulate any way in which those men received different treatment than she did, and it is unclear whether they even performed the same job tasks. ECF 59-1 at 81-84.  Plaintiff does not argue those men as comparators in her opposition. ECF 62 at 31 (citing only Ms. Cha).

10

and so, unlike Plaintiff, Ms. Cha did not have the ability to automatically advance to GS-12 while serving in the same role. While Plaintiff's primary complaint is that she was not promoted to GS-12 on the one-year anniversary of her hiring into a GS-11/12 position, Ms. Cha, as a strict GS-11, simply did not have that same opportunity, and, in fact, was never given a permanent promotion to GS-12 during her employment at CHRA. Ms. Cha, who started employment at CHRA well before Plaintiff, only received a temporary promotion to GS-12 upon Plaintiff's departure, which terminated after a set period of time., ECF 59-11 at 17-24. Thus, even crediting Plaintiff's assertion that Ms. Cha received more favorable performance evaluations than Plaintiff, it did not translate into a more rapid opportunity for her advancement in the workplace. Similarly, Plaintiff's suggestion that Ms. Cha received more in-person training, at greater cost to CHRA, did not benefit Ms. Cha in the terms and conditions of her employment by permitting her faster promotional opportunities. Finally, the record is clear that Ms. Cha was employed at CHRA as of December, 2011, when CHRA brought all of its analysts in from the field to a weeklong training in APG on the new GFEBS system. ECF 59-14 at 19. Ms. Coleman did not start until February of 2012, after that universal in-person training had occurred. Thus, the fact that Ms. Cha received in-person training that Ms. Coleman did not is unrelated to their membership in any particular racial or color group. In the end, given the distinct differences between the job duties, GS classifications, and employment histories of Ms. Cha and Ms. Coleman, they are not similar in all relevant respects for purposes of the required analysis.

Even had Plaintiff been able to establish all of the elements of a prima facie case of discrimination, she has offered no evidence of pretext that would overcome Defendant's proffered legitimate, non-discriminatory reason for the four-month delay in her promotion: her dissatisfactory early performance, which was later remedied after the in-person training.

11

Plaintiff's subjective belief that she received unfair treatment based on her race, color, or gender, and that her eventual promotion was as a result of her EEO complaint and not her improved performance, is not based on any factual predicate, and cannot defeat Defendant's summary judgment motion. *See, e.g.*, *Williams v. Cerberonics*, 871 F.2d 452, 455 (4th Cir. 1989) ("[A] Plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."); *Settle v. Balt. Cty.*, 34 F. Supp. 2d 969, 999 (D. Md. 1999) (finding plaintiff's subjective belief that defendant's action was racially motivated was insufficient, in the absence of articulable facts showing a "racial nexus"); *Vazquez v. Md. Port Admin.*, 937 F. Supp. 517, 522 (D. Md. 1995) ("Generalized testimony by an employee regarding [plaintiff's] subjective belief that the adverse action was the result of discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate nondiscriminatory reason for the action."). Plaintiff propounds no evidence suggesting a link between her negative performance evaluation, her delayed promotion, and her race, color, or gender. Summary judgment is therefore warranted on Count One.

### B. Hostile Work Environment

In Count Three, Plaintiff alleges that Defendant violated Title VII by subjecting her to a hostile work environment, which exists where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). To establish a Title VII claim for a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and

to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable," depending on whether the harassment "culminates in a 'tangible employment action.'" *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 333, 333 n.6 (4th Cir. 2018) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 429-31 (2013)). In contrast, harassment by a coworker or a third-party, resulting in a hostile work environment, can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (quoting *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir.1995)).

Plaintiff does not allege many specific comments relating to her race or color, and no specific comments relating to her gender.[4] She generally alleges that she was subjected to disrespectful treatment and aggressive, harsh, and negative comments, but simple mistreatment or rude conduct does not suffice to support a hostile work environment claim. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (explaining "complaints premised on nothing

---

[4] Plaintiff's allegations relating to the questions posed by the officer investigating claims against Mr. Bridges, while arguably gender-related because they suggested a possible intimate relationship with Mr. Bridges, cannot be attributed to her supervisors. In fact, it is clear from Plaintiff's declaration that while she may have harbored certain suspicions, even after discovery she has no actual evidence that her supervisors made any gender-related comments to the investigator. *See* ECF 62-1 ¶ 20 ("Although the complaints were submitted anonymously, I was pretty certain it originated from Ms. Cha, Mr. Skillin and perhaps, Mr. Dickman because these were the people I worked with. After the investigation started and I was interviewed and, based on the questions asked by the investigator, it was clear the complaint originated from one or more of those three."); ¶26 ("Ms. Cha, Mr. Skillin, Mr. Dickman *and possibly others* chose to supply the investigator and CHRA with disparaging information about me that was not based in fact and skewed.") (emphasis added).

more than 'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor'" do not suffice (alterations in original) (citations omitted)); *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (finding a workplace dispute and "some perhaps callous behavior by her superiors" insufficient for a plaintiff to establish severe or pervasive activity, even at the Rule 12(b)(6) stage); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003) (determining that "disrespectful, frustrating, critical, and unpleasant" workplace interactions do not create a hostile work environment). Other than her unsubstantiated perception that the personality conflict was race-based, Plaintiff offers no evidence linking her coworkers' unpleasant behavior to her membership in protected classes.

Additionally, the few race-related comments Plaintiff does specifically allege are not sufficiently "severe" or "pervasive" to plausibly state a claim for hostile work environment. While she alleges a "rumor mill" related to the basis for her hiring, she does not allege the dates or frequency of such comments, or any particular concentration over a limited time frame, sufficient to meet the "high bar in order to satisfy the severe or pervasive test." *Sunbelt Rentals, Inc.*, 521 F.3d at 315; *see also Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.*, Civil No. JKB-19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (stating, with respect to general allegations of consistent "condescending and abusive language and behavior," "[w]ithout details about the nature of the remarks and behavior at issue, it is impossible for the Court to determine whether the behavior she complains of would be seen as objectively hostile by a 'reasonable person'"); *Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1462 (N.D. Ind. 1992) (finding plaintiff's allegations of being reprimanded more severely than co-workers, without reference to exact dates, to be

insufficient to support a harassment claim), *aff'd*, 13 F.3d 1130 (7th Cir. 1994). In fact, she does not clarify how she learned about the contents of the "rumor mill" at all.

Plaintiff did allege that Ms. Cha, a lower-ranked co-worker, told her that she was only hired by Mr. Bridges because of her race and color. ECF 62-1 ¶ 10. Even if that isolated discriminatory statement were pervasive enough to constitute a hostile work environment, such statements by a co-worker can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman*, 750 F.3d at 422-23 (quoting *Amirmokri*, 60 F.3d at 1131). Plaintiff's vague declaration does not specifically allege that she reported Ms. Cha's race-based remark to her supervisors. The record reflects that Mr. Skillin and Mr. Dickman were well-aware of the personality conflict between Plaintiff and Ms. Cha, but the only isolated race-based comments Ms. Cha made to Mr. Skillin were one comment that Plaintiff did not like Korea and one comment that Mr. Bridges had not promoted Ms. Cha because she was not African-American. There is a distinct difference between Ms. Cha reporting that Mr. Bridges had made a race-based decision not to promote her and reporting that Plaintiff had only been hired because she was African-American. The evidence suggests that Ms. Cha only stated the former, not the latter, to Mr. Skillin. Ultimately, no evidence suggests that Mr. Skillin knew or should have known that Ms. Cha was harassing Plaintiff on the basis of her race.

Similarly, Plaintiff's allegations of poor treatment at the hands of Mr. Skillin and Mr. Dickman are insufficiently particular or related to race, color, or gender to bolster a hostile work environment claim. Even by Plaintiff's own allegations, any comments referencing her race were made by her, not by her supervisors. *See* ECF 62-1 ¶ 17 (Plaintiff asking Mr. Skillin, "are you sure it isn't because I'm black?"); *id.* ("Mr. Skillin continued to make negative remarks towards

15

me and I repeatedly reminded him that he was embracing racial stereotypes and that his attitude towards me was because I was a black female."); *id.* ¶ 25 ("I also expressed to both Mr. Skillin and Mr. Dickman on several occasions I believed that both they and Ms. Cha did not like me because I was African-American/Black and because Mr. Bridges had selected me."); *id.* ¶ 35 (noting that she "made numerous complaints to both Mr. Skillin and Mr. Dickman that they were also mistreating me because of my race/color"); *id.* ¶¶ 43-44 ("I then asked [Mr. Skillin] how, if he did not give anyone performance standards or give anyone midpoint assessments to let them know what was expected of them and how they were performing then what did he use to assess the non black/non African American employees in CHRA-FE who he gave Excellent ratings to as compared to the negative rating he gave to me.  As was typical with Mr. Skillin, he refused to answer my questions regarding the differences in treatment due to race/color and instead turned the subject back to me.").  The fact that Plaintiff ascribed racial motivation to her supervisors' otherwise race-neutral criticisms of her performance is insufficient to establish a hostile work environment, which must be discriminatory and not merely unpleasant to be actionable.  Summary judgment for Defendant is thus also appropriate on Count Three.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 58, will be GRANTED, and this case will be closed.  A separate Order follows.


Dated: January 15, 2021                                      /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge